## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:23-cr-00074 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| MORRIS CARTER III | ) | |
| | ) | |
| | ) | JULY 25, 2025 |

<u>MEMORANDUM OF DECISION</u>
**RE: DEFENDANT'S MOTION TO SUPPRESS (ECF No. 89)**

Kari A. Dooley, United States District Judge

Defendant Morris Carter III ("Defendant") was charged in a two-count superseding indictment returned on February 5, 2025, with Unlawful Possession of a Firearm and Ammunition by a Felon (Count One) in violation of 18 U.S.C. § 922(g)(1) and 924(a)(8), and Unlawful Possession of a Firearm with an Obliterated Serial Number (Count Two) in violation of 18 U.S.C. § 922(k) and 924(a)(1)(B). On June 12, 2025, Defendant moved to suppress a "show-up" identification, evidence seized during a subsequent automobile search, and all "fruits" of those allegedly unconstitutional actions. *See* Def.'s Mot. to Suppress ("Def.'s Mot."), ECF No. 89. The Government opposes, and Defendant filed a reply in support of his motion on July 14, 2025. S*ee* Gov. Opp'n, ECF No. 105; Def.'s Reply, ECF No. 110. For the reasons that follow, the Motion to Suppress is DENIED.

**The Traffic Stop, "Show-Up" Identification, and Search**

The parties largely agree on the events of February 19, 2023, which culminated in a traffic stop, Defendant's subsequent "show-up" identification by an individual who had been assaulted earlier that morning, and a search of the vehicle that Defendant was driving. Both parties rely heavily on body worn camera ("BWC") footage from various involved officers. *See* Def.'s Mot.,

Exs. A–H, ECF No 89-1; Gov. Opp'n, Exs. 2, 3, 5, ECF No. 105-1; Def.'s Reply, Ex. A, ECF No. 110-1.[1] In addition, the Government has submitted the corresponding Hartford Police Department ("HPD") incident report prepared by Officer Nunez, much of which is corroborated by the compiled BWC footage. Gov. Opp'n, Ex. 1, HPD Incident Report ("Incident Report"), ECF No. 106 at 2–6.

On February 19, 2023, at approximately 3:50 AM, HPD Officers responded to 675 Wethersfield Avenue in Hartford's South End on a report of an altercation between two men at a gas station. Gov. Opp'n at 2. Officer Steven Doyle was one of the first officers on the scene, exiting his vehicle at 3:55 AM. *Id.*; Def.'s Opp'n, Ex. A ("Doyle BWC, Def.") at 2:45. Upon arrival, he began speaking with the victim, "S.K." while receiving radio messages from other officers that the alleged assailant had left the scene in a black Toyota Camry, license plate number A\*\*\*\*\*8.[2] Gov. Opp'n at 2; Incident Report at 2–3. Other officers, who had been canvassing the area for the black Camry, eventually found the car headed northbound on Franklin Avenue. Gov. Opp'n at 2. Officers made two attempts to get the driver to stop using lights and sirens, but he did not comply. Eventually, HPD called off the pursuit and informed the Wethersfield Police Department ("WPD") of the suspect vehicle's direction of travel. *Id.*

While talking with Officers Doyle and Nunez, S.K. reported that he was standing in line inside the gas station's convenience store at 675 Wethersfield Avenue when he got into a verbal altercation with another man. *Id.* at 2–3. At some point, according to S.K., the other individual produced a pistol, took the magazine out, and struck S.K. in the face and head with the magazine.

---

[1] The ECF numbers provided for the parties' BWC exhibits are placeholders for digital storage devices that were manually filed with the Court. The Court has reviewed all video evidence submitted by the parties.

[2] According to the HPD Incident Report, the clerk at the gas station reported the altercation to HPD dispatch. Incident Report at 2–3. He informed dispatch that one of the men involved had a firearm, the other was bleeding from his face, and "one of the males entered a black Toyota Camry bearing Connecticut Marker Plate A\*\*\*\*\*8 and drove West bound on Brown Street towards Franklin Avenue." *Id.*

*Id.* at 2; Gov. Opp'n, Ex. 2 ("Doyle BWC, Gov.") at 6:10.[3] Officers observed that there were several live rounds of ammunition in and around the door to the convenience store. S.K. indicated to the officers that he could identify the person who attacked him if he saw him. Gov. Opp'n at 2–3.

As HPD officers talked to S.K. at the gas station, at approximately 4:02 AM, WPD officers stopped the suspect black Camry on Knott Street in Wethersfield. Def.'s Mot. at 5. They detained Defendant, who was driving, and his female passenger, N.H. *Id.* at 1. N.H. first told officers that the car belonged to her mother, before she later confirmed that it was registered to her sister. Gov. Opp'n. at 3. When asked by WPD officers at 4:05 AM, N.H. told them that it was her mother's car and stated, "she let me use it." Gov Opp'n, Ex. 3 ("Cavanna BWC, Gov.") at 2:23. At 4:10 AM one of the officers at the scene of the traffic stop suggested that because N.H. was the "owner" of the Camry they could get her consent and search it. Cavanna BWC, Gov., at 7:28. HPD officers also responded to the traffic stop in Wethersfield. At 4:28 AM, HPD Officer Barrett confirmed (incorrectly) with N.H. that the Camry belonged to her mother. Gov. Opp'n, Ex. 5, ("Barrett BWC, Gov.") at 1:48. Barrett then asked N.H. if she would "do a consent to search on the car," to which she said "yeah," and told Barrett to "go ahead." *Id.* at 1:50–2:16.

After interviewing other witnesses in the convenience store and consulting with his fellow officers at the gas station, Officer Nunez had S.K. sign a witness identification form. Def.'s Mot. at 5. At 4:36 AM he left the gas station with S.K. and drove to the traffic stop on Knott Street to conduct a show-up identification. *Id.* at 6; Def.'s Mot., Ex B ("Nunez BWC, Def.") at 39:10. The officers already at the traffic stop had Defendant stand near the road, illuminated with spotlights,

---

[3] The Government writes that S.K. reported that "the assailant pistol whipped him with a firearm." Gov. Opp'n at 2. While S.K. answered "yes" on several occasions when asked if he was pistol whipped, when he offered a more detailed account of the assault to the responding officers, he stated that the attacker removed the magazine from the weapon and used that to strike him. *See* Def.'s Mot., Ex. B ("Nunez BWC, Def.") at 4:50

while Officer Nunez drove by with S.K. in his vehicle. Def.'s Mot. at 6. Officer Nunez drove by twice between 4:42 and 4:45 AM. Nunez BWC, Def., at 44:22–47:23. S.K. identified Defendant as his assailant, Officer Nunez called it in as a "positive ID," parked his vehicle, and left S.K. in the back seat while he joined the investigation on Knott Street. Def.'s Mot. at 6–7.

By 4:48 AM, after the show-up, Officer Barrett had completed his portion of N.H.'s consent to search form. He read the form to her, ensured that she understood, and N.H signed it at 4:51 AM. Barrett BWC, Gov., at 22:50–24:10; Gov. Opp'n, Ex. 4 ("Consent to Search Form"), ECF No. 106-1. As Officer Barrett moved to begin searching the car, he radioed to confirm its registration. Id. at 25:16. As he did so, Officer Nunez told him that he didn't think N.H. could consent to the search because she was not the registered owner. Id. at 25:45; Def.'s Mot. at 10. Shortly thereafter, Officer Barrett confirmed that the Camry was not registered to N.H.'s mother, but rather to her sister. Gov. Opp'n at 7. N.H. can be heard on Officer Barrett's BWC stating "it's under her name but its my mom's car." Barrett BWC, Gov., at 26:29.

At 4:57 AM, a group of officers, including Officer Nunez, talked to N.H., and again confirmed that the Camry was registered to her sister. One of the other officers (incorrectly) told N.H. that she could not provide consent to search because she is not the registered owner, and that they could not release the vehicle to her unless she called her sister. Def.'s Mot. at 10-11. Officer Nunez again expressed doubts as to whether they could search on N.H.'s authorization, and someone suggested "let's see what the boss says." Nunez BWC, Def., at 1:01:15. Nunez conferred with Sergeant Rowe at 4:59 AM. Id. at 101:34. He told Sergeant Row his concerns about N.H.'s ability to provide consent to search. Sergeant Rowe instructed him that if he already had probable cause, the vehicle could be searched under the motor vehicle exception. Def.'s Mot. at 11; Def.'s Mot., Ex. E ("Rowe BWC, Def.") at 59:40. At 5:07 AM, after making a phone call, possibly to

another Sergeant, in which he discussed probable cause and S.K.'s positive identification of Defendant, Rowe instructed Nunez to search the Camry. Def.'s Mot. at 11–12. Officers Nunez and Barrett conducted the search, and found a nine-round magazine with seven cartridges inside it under the passenger seat. *Id.*; Nunez BWC, Def., at 1:12:30

On April 26, 2023, a federal grand jury returned a two-count indictment arising out of the events of February 19, charging Defendant with Unlawful Possession of a Firearm by a Felon and Unlawful Possession of a Firearm with an Obliterated Serial Number. Indictment, ECF No. 1. Defendant moved to dismiss the indictment, arguing that 18 U.S.C. § 922(g) was unconstitutional facially and as applied to him following the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). *See* Def.'s Mot. to Dismiss, ECF No. 43. That motion was denied by the Court via a memorandum of decision issued August 13, 2024. *See* ECF No. 51. On February 5, 2025, a grand jury returned the operative Superseding Indictment, charging Defendant with Unlawful Possession of a Firearm and Ammunition by a Felon (Count One) in violation of 18 U.S.C. § 922(g)(1) and 924(a)(8), and Unlawful Possession of a Firearm with an Obliterated Serial Number (Count Two) in violation of 18 U.S.C. § 922(k) and 924(a)(1)(B). Superseding Indictment, ECF No. 66.

In the instant motion, Defendant seeks to suppress the show-up identification conducted by Hartford and Wethersfield Police officers on the morning of February 19, 2023, as well as evidence seized during the subsequent search of N.H.'s Toyota Camry. Defendant relies exclusively on BWC footage from several officers at both scenes as supporting his claims regarding the show up and his challenge to the subsequent vehicle search. In its Opposition, the Government represents that it does not intend to offer the show-up identification as evidence at trial, and argues that the vehicle search was valid due to the consent provided by N.H. as well as

under the automobile exception to the warrant requirement. In his Reply, Defendant challenges Officer Barrett's credibility with respect to N.H.'s purported consent, and requests an evidentiary hearing to explore the issue. However, the factual narratives provided by the Defendant and the Government are consistent with each other and the BWC footage. The only disputes, therefore, are the legal conclusions the parties ask the Court to draw.

Having considered all of the submissions, the Court concludes that the motion to suppress should be denied and that no evidentiary hearing is necessary in order to render that decision.

**The Fourth Amendment**

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015) (quoting U.S. Const. amend. IV). "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "In most cases, reasonableness requires a warrant and probable cause." *United States v. Lifshitz*, 369 F.3d 173, 178 (2d Cir. 2004). Indeed, searches conducted without a warrant are "'*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Navas*, 597 F.3d 492, 497 (2d Cir. 2010) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "Once a defendant with a reasonable expectation of privacy in the area searched challenges a warrantless search as unreasonable under the Fourth Amendment, the burden is on the government to demonstrate that the search was within one of the recognized exceptions." *United States v. Peña Ontiveros*, 547 F. Supp. 2d 323, 330 (S.D.N.Y. 2008), *aff'd sub nom. United States v. Rico Beltran*, 409 Fed. App'x 441 (2d Cir. 2011).

Relevant here, voluntary consent is a "well-recognized exception to the warrant requirement." *Wilson v. Soucy*, No. 3:18-CV-1680 (AWT), 2020 WL 5764117, at *9 (D. Conn.

Sept. 28, 2020) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 231-32 (1973)). "Consent may validly be granted by the individual whose property is to be searched, or by a third party who possesses common authority over the premises." *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995) (citing *Schneckloth*, 412 U.S. at 222; *United States v. Matlock*, 415 U.S. 164, 171 (1974)). This common authority does not depend on "the mere property interest a third party has in the property," but instead "rests on mutual use, control, or co-habitation." *United States v. Mahama*, No. 3:23-CR-177, 2024 WL 3826686, at *3 (D. Conn. Aug. 15, 2024) (quoting *Matlock*, 415 U.S. at 171, n. 7). Third-party consent validates a search "if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." *United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992).

However, "even if a third party lacks actual authority to consent to a search of a particular area, [s]he still may have apparent authority to consent to the search." *Moore v. Andreno*, 505 F.3d 203, 209 (2d Cir. 2007). In determining whether a third party possessed such apparent authority, courts must apply an objective standard: "would the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *United States v. McGee*, 564 F.3d 136, 139 (2d Cir. 2009) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). This rule though, applies only to officers' mistakes of fact, not of law. *Moore*, 505 F.3d at 209 ("For example, an investigator's erroneous belief that landladies are generally authorized to consent to a search of a tenant's premises could not provide the authorization necessary for a warrantless search." (citation omitted)).

The "automobile exception" is another recognized exception to the Fourth Amendment's warrant requirement. It allows police to "conduct a warrantless search of a readily mobile motor

vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004). Therefore, if the probable cause justifying a search includes the entire vehicle, "the permissible scope of the search pursuant to this exception includes every part of the vehicle and its contents including all containers and packages that may conceal the object of the search." *United States v. Wilson*, 699 F.3d 235, 246 (2d Cir. 2012) (internal quotations and citations omitted).

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. Probable cause is assessed based upon the totality of the circumstances and may be found where a law enforcement official "has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *United States v. Howard*, 489 F.3d 484, 491 (2d Cir. 2007) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). "[P]robable cause is a flexible, common-sense standard . . . [and] the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (citation and internal quotation marks omitted).

**Discussion**

*Show Up Identification*

Defendant first argues that the show-up identification procedures by which S.K. identified him were unduly suggestive and therefore violated his Fourteenth Amendment right to due process. In response, the Government indicates that it does not plan to introduce the on-scene

show-up identification at trial. In light of the Government's representation, Plaintiff's motion to suppress the show-up identification is DENIED as moot. *See United States v. Thomas*, No. 3:13-CR-00141 VLB, 2014 WL 2168468, at *7 (D. Conn. May 23, 2014) ("As the Government does not intend to offer the evidence Defendant seeks to exclude, the Court DENIES Defendant's motion as moot."); *United States v. Tontisabo*, No. 21-CR-701 (LAK), 2023 WL 411622, at *5 (S.D.N.Y. Jan. 25, 2023) ("The government does not intend to introduce the May 2020 Identification at trial and therefore the issue is not addressed as moot.").[4]

*Vehicle Search*

Defendant also argues that officers did not have probable cause to search the Camry without a warrant, and that therefore the automobile exception does not apply. He further contends that because N.H. was not the registered owner of the Camry and some officers, most prominently Officer Nunez, themselves doubted that she could provide consent to search the vehicle, she lacked the apparent authority to validate the search. In response, the Government asserts that N.H. had actual authority to consent to the search, rendering her apparent authority (or lack thereof) immaterial. Further, the Government argues that even had the officers not obtained her consent, the search was valid under the automobile exception. The Court agrees with the Government.

First, the officers' erroneous legal opinions notwithstanding, as a matter of law, N.H. had the actual authority to consent to the vehicle search. Applying the two-pronged *Davis* standard, she had access to the vehicle and permission to gain that access from her sister and/or mother. As she stated to WPD officers at 4:05 AM, referring to her mother, "She let me use it." Cavanna

---

[4] In his Reply brief, Defendant contends that the Government's plan not to introduce the show-up identification at trial "should… be taken by the Court as an admission by the government that law enforcement engaged in illegal conduct," and via a footnote appears to suggest that his initial detention was unlawful. Def.'s Reply, ECF No. 110, at 1. Defendant, however, identifies no basis on which to challenge the motor vehicle stop that led to Plaintiff's initial detention in either his Motion or his Reply. Indeed, given that the police had a description of the assailant's vehicle, the direction of travel and the vehicle's license plate, any suggestion that the motor vehicle stop was not justified is wholly unfounded. *See Terry v. Ohio*, 392 U.S. 1 (1968).

BWC, Gov. at 2:23. Courts in this Circuit and elsewhere have oft held that an individual who borrows a vehicle has the authority to consent to a search of that vehicle. *See United States v. Casseus,* No. 06-CR-832 (DLI), 2007 WL 4029497, at *6 (E.D.N.Y. Nov. 15, 2007) (holding that a defendant, who was driving his girlfriend's car with her permission, voluntarily consented to a search by signing a consent form); *United States v. Ho*, No. 22-50294, 2024 WL 359382, at *2 (9th Cir. Jan. 31, 2024) (holding that a defendant driving a borrowed car had unequivocally withdrawn his previously granted consent to search the vehicle). Further, in *United States v. Gradowski*, the Second Circuit held that a third party has actual authority to consent to a search even if they are not driving or riding in a vehicle, so long as the owner left the car in the third party's care and gave them the keys. 502 F.2d 563, 564 (2d Cir. 1974). In *Gradowski* the court noted that the second prong of the test for actual authority is satisfied by "permission to exercise that access*, express or implied*." 502 F.2d at 564 (emphasis added). The mere fact that N.H. was using her sister's vehicle, stated that she was doing so with her mother's permission, and absent any indication that her use was not permissive, establishes actual authority.[5]

The Court recognizes that Officer Nunez and a female officer expressed ambivalence as to whether N.H. could consent to a search when she was not the registered owner of the Camry. And when he expressed those doubts to a superior, Sergeant Rowe, Rowe authorized the search based on probable cause and the automobile exception rather than N.H.'s consent. But this series of events does not change the fact that: N.H. had authority to give consent to the search; Officer Barrett did obtain N.H.'s consent, both verbal and written; and he did so prior to the search that produced the magazine and ammunition that Defendant seeks to suppress. *See Brigham City, Utah*

---

[5] Notably, Defendant does not argue otherwise. Although he notes that N.H. was not the registered owner of the car, and that Officer Nunez and a female officer *believed* that she therefore could not consent to the search, he does not argue (for good reason) that N.H. could not consent to the search unless the car was registered to her. *See* Def.'s Mot. at 2, 12.

*v. Stuart*, 547 U.S. 398, 404, (2006); *see also Maryland v. Macon,* 472 U.S. 463, 470–71 (1985) ("Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken." (internal quotations and citation omitted)).

Because the Court concludes that N.H.'s consent was sufficient to justify the warrantless search of the Camry, it need not address whether or not officers had probable cause to search the vehicle under the automobile exception and/or the impact of the arguably overly suggestive show-up procedure on the probable cause analysis.

*Evidentiary Hearing*

Defendant challenges the credibility of Officer Barrett who, he alleges, lied to his superiors and subsequently to the Government regarding a tire blow-out on his HPD vehicle. Defendant, after reviewing discovery materials, identified Officer Barrett as suffering the blowout "while giving chase to the vehicle subsequently stopped by Wethersfield law enforcement," but alleges that "when asked by his Sergeant about the flat tire, lied and indicated that it had happened at some earlier time." Def.'s Reply, ECF No. 110, at 2. In support, Defendant provides BWC footage purportedly documenting Officer Barrett's inconsistent statements. *See* Def.'s Reply, Ex. A, ("Barrett BWC, Def."). Defendant further avers that Officer Barrett represented to the Government "that the flat tire to his cruiser happened earlier in the day 'prior to the 'Carter call,'" and that this representation shows Barrett "continuing his duplicity." Def.'s Reply at 3. Because Officer Barrett was responsible for obtaining N.H.'s verbal and written consent to search the Camry, Defendant asserts that his inconsistency in reporting the flat tire demonstrates a credibility issue sufficient for the Court to hold an evidentiary hearing on the issues raised in his Motion to Suppress. *Id.* at 2.

A defendant is entitled to an evidentiary hearing if he can demonstrate a contested issue of material fact. *United States v. Pena*, 961 F.2d 333, 339 (2d Cir.1992). The defendant must offer "sufficiently definite, specific, detailed, and nonconjectural" information so as to enable the court to conclude that there are contested facts which go to the validity of the search. *Id.* To satisfy this obligation, a defendant must submit sworn factual allegations from a person with personal knowledge of the events at issue. *United States v. Viscioso,* 711 F.Supp. 740, 745 (S.D.N.Y.1989). In the absence of such an affidavit, no evidentiary hearing is required. *Id.* Nor is a hearing required if the defendant's allegations are general and conclusory. *Id.* Defendant here has submitted no sworn factual allegations at all, let alone any refuting that N.H. did, in fact, give consent to search the Camry. And even if it is established that Officer Barrett was dishonest when speaking with various actors about the flat tire[6], that misrepresentation is immaterial to the validity of the consent search.[7] Finally, the entirety of Officer Barrett's interactions with N.H. at the scene on Knott Street were themselves captured on his BWC, confirming that he did not fabricate or coerce her consent. Indeed, N.H. was calm and cooperative throughout the interaction.

Defendant provides no definite, specific, or detailed information that would cause the Court to conclude there are any contested facts with respect to the search. An evidentiary hearing is therefore not required.

---

[6] The Defendant's argument regarding the footage he relies upon involves interpretation of what is being said. The Court does not, because it need not, determine whether the footage establishes duplicity on Officer Barrett's part. But the Court observes that the statements relied upon are not, necessarily, inconsistent at all. Officer Barrett appears to be talking about two separate events, the first where a piece of metal got into his tire and a second, when the tire went flat during the pursuit of the Defendant as a result. In any event, this issue can be explored on cross-examination at trial.

[7] In the distinct but somewhat analogous analysis as to whether a defendant is entitled to an evidentiary hearing regarding misrepresentations in a search warrant affidavit pursuant to *Franks v. Delaware*, 438 U.S. 154, 164–72 (1978), a court determines if a misrepresentation was material to a probable cause determination by setting aside the falsehoods in the affidavit and examining whether the untainted remainder establishes probable cause. *United States v. Garlick*, No. 22-CR-540 (VEC), 2023 WL 2575664, at *7 (S.D.N.Y. Mar. 20, 2023) (*citing United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013). Here, setting aside Officer Barrett's purported falsehoods has no effect on the validity of the search. As discussed, the verbal consent is heard on the bodycam footage and the written consent is not otherwise challenged.

**Conclusion**

For all of the foregoing reasons, the Motion to Suppress, ECF No. 89, is DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 25th day of July, 2025.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE