UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:23-CR-00074 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| MORRIS CARTER, III | ) | OCTOBER 7, 2025 |

**MEMORANDUM OF DECISION**
**RE: MOTION FOR JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL (ECF No. 150)**

Kari A. Dooley, United States District Judge

Following a jury trial, the jury found Defendant Morris Carter III ("Defendant" or "Carter") guilty of unlawful possession of a firearm or ammunition by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (Count One); and unlawful possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B) (Count 2).

Pending before the Court is Defendant's post-trial motion for judgment of acquittal or, in the alternative, a new trial, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. The Government opposes the motion. For the reasons that follow, Defendant's motion is DENIED.

**Procedural History**

On April 26, 2023, a federal grand jury returned a two-count Indictment charging Defendant with unlawful possession of a firearm by a felon and unlawful possession of a firearm with an obliterated serial number. *See* Indictment, ECF No. 1. On February 5, 2025, the grand jury returned a Superseding Indictment (the "SI") against Defendant, this time charging him with unlawful possession of a firearm *and ammunition* by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8), and unlawful possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B). *See* SI, ECF No. 65. The Government subsequently

moved to amend the SI to correct a typographical error in the serial number on one of the firearms that Defendant allegedly possessed. *See* ECF No. 133. The Court granted the Government's motion and docketed a Corrected Superseding Indictment (the "CSI") at ECF No. 135.

Defendant elected to be tried by a jury, and jury selection was held on August 12, 2025. The jury heard evidence over the course of three days, commencing on August 13, 2025, and on August 15, 2025, returned a guilty verdict as to both Counts. At the conclusion of the Government's case in chief, Defendant made an oral motion for a judgment of acquittal. *See* Aug. 15 Trial Tr., ECF No. 145 at 506–07. The Court reserved decision, and on August 18, 2025, Defendant filed the instant motion, with a memorandum in support on August 25, 2025. *See* Def.'s Mot., ECF No. 150; Def.'s Mem. in Supp., ECF No. 155. The Government filed its opposition to the Motion on September 15, 2025. ECF No. 164.

**Standard of Review**

*Motion for Judgment of Acquittal*

"Under Rule 29, a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. A defendant who challenges the sufficiency of the evidence to support his conviction bears a heavy burden. Not only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, but the jury verdict must be upheld if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (cleaned up).

When evaluating the sufficiency of the evidence, courts must "bear in mind that the jury's verdict may rest entirely on circumstantial evidence." *Id*. "When making a case based on

circumstantial evidence, the government need not 'exclude every reasonable hypothesis other than that of guilt.'" *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)). Moreover, "it is the task of the jury, not the court, to choose among competing inferences." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). Rule 29 does not provide the trial court with an opportunity to "substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984); *accord United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016). Thus, "the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Guadagna*, 183 F.3d at 130 (citation and internal quotation marks omitted).

### *Motion for a New Trial*

Rule 33 provides that the district court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). "In evaluating a Rule 33 motion, the court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)). "In other words, there

must be a real concern that an innocent person may have been convicted" for the ordering of a new trial to be appropriate. *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (cleaned up).

**Discussion**

### *The Motion for Judgment of Acquittal*

#### *The Constitutionality of Section 922(g)*

Defendant again challenges the constitutionality of Section 922(g), an argument the Court has already rejected, ECF No. 51, and does not revisit here. It is worth observing, however, that this Court's reliance on *United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013) as a binding determination on the issue has since been largely vindicated. *See Zherka v. Bondi*, 140 F. 4th 68, 74–75 (2d Cir. 2025).

#### *Sufficiency of the Evidence at Trial*[1]

The evidence at trial established that at approximately 3:50 a.m., Hartford Police dispatch received a 911 call from witness Lerinluxshan Balachandran,[2] the manager of the market/gas station located at 675 Wethersfield Avenue, Hartford, Connecticut, who reported an altercation at the market. Mr. Balachandran further told the 911 dispatcher that the assailant had fled the scene driving a black Toyota Camry bearing license plate AT 07658. Upon arrival, officers observed S.K. bleeding profusely from his head. The officers also observed multiple rounds of loose ammunition scattered about both inside the market and outside the market on the sidewalk and in the parking lot. The ammunition, 19 rounds, were seized. Officers retrieved the surveillance footage from both inside and outside the market.

---

[1] The Court does not cite to the record evidence in the section to follow. The Court has read and reviewed the trial transcript and corresponding exhibits, from which it draws its factual assertions.

[2] The Court notes that Mr. Balachandran's first name is spelled inconsistently in the record and intends no disrespect by any potential misspellings.

The surveillance footage showed S.K. walking up to the counter, at which point he was approached, or perhaps confronted, by an individual who had been waiting in line, holding a bottle of water. Mr. Balachandran testified that the individual showed S.K. a firearm that was under his coat. After a few moments, a scuffle ensued as both S.K. and the assailant could be seen fighting for control of the firearm, which, consistent with Mr. Balachandran's observation, appeared to have been inside the front of the assailant's coat. The assailant's coat was a dark winter parka with a fur-lined hood. He was wearing jeans with holes in the denim on both thighs. He was also wearing glasses as well as very distinctive sneakers. During the struggle, the assailant broke free of S.K.'s grasp and struck S.K. multiple times in the head with an extended magazine. Bullets could be seen exiting the magazine as it was used to beat S.K. After a short time, the fight moved outside.

The surveillance footage from outside the market showed the assailant continuing to strike S.K. Eventually, the assailant moved out of view; the footage showed a black sedan in the background driving away. This coincided with Mr. Balachandran's 911 call and description of the assailant's departure as well as the vehicle he was driving.

While Hartford police officers Barrett and Rivera were on route to the market, responding to the 911 dispatch, they spotted the black Camry with license plate AT 07658 on Franklin Avenue. Officer Barrett, who testified, and Officer Rivera attempted to stop the vehicle, having activated both lights and sirens. The Camry did a U-Turn and sped away travelling south toward Wethersfield. Although the Officers followed, a supervisor called off the chase. Of note, the Wethersfield town line was not far from the market or the location of the abandoned chase. Officer Barrett testified that he watched the Camry travel south on Franklin Avenue eventually making a right-hand turn onto a side street, which was over the Wethersfield town line. The Officers'

dashcam showed the Camry taking a right-hand turn off of Franklin Avenue before it disappeared from view.

Wethersfield police were notified and given a "Be On the Lookout" request for the black Camry. At approximately 4:00 a.m., a mere 10-15 minutes after the Camry fled the market, Wethersfield Police Officer Givens, who testified, spotted the Camry and instituted a motor vehicle stop. The evidence included both dashcam and body camera footage of the stop. The police first ordered the driver to throw the car's keys out the window, which he did. The police then ordered the driver to exit the vehicle, to raise his hands, to take a few steps backwards, and then kneel on the road. He complied with all commands.

The driver was wearing a distinctive dark parka with a fur-lined hood that appeared identical to the assailant's parka. He was wearing distinctive sneakers that appeared identical to the assailant's sneakers. He was wearing jeans. And, of course, he was driving a black Camry with license plate AT 07658. The driver also had fresh blood on his hands, visible when he was placed in handcuffs.

A search of the vehicle revealed a loaded 9mm magazine under the front passenger seat in which N.H., Defendant's then-girlfriend, had been seated. The driver was arrested and identified at the scene as Defendant Morris Carter, III. Further, surveillance photos from the Hartford Police Department booking area, revealed that the jeans the Defendant was wearing at the time of the motor vehicle stop had what appeared to be identical holes to those shown in the market surveillance footage.

The timeline, the videos, the booking photographs, and the Defendant's identification alone are sufficient for the jury to have reasonably concluded that the Defendant was the assailant in the

market, and thus, he was in possession, at the very least, of the 19 rounds of ammunition contained in the magazine which were scattered about the market. Nonetheless, there is yet more evidence.

N.H. testified that on the night in question, she travelled with the Defendant in her mother's car, the black Camry, to the market to get water. The assailant was waiting in line holding a bottle of water. N.H. positively identified the Defendant as the individual in the surveillance footage. N.H. was in the Camry when it was stopped 10-15 minutes after leaving the market. Although N.H. admitted to being very intoxicated on the night in question, her testimony was corroborated in multiple respects. And of course, she wasn't intoxicated during her testimony and she was certainly capable of identifying the Defendant as the person in the fur-lined hooded parka in the surveillance footage.

In addition, the Defendant wears glasses. N.H. testified that he was wearing his glasses when he drove to the gas station/market and, indeed, the assailant was wearing glasses at the beginning of the surveillance footage. She further testified that he was not wearing his glasses when he returned to the Camry. The surveillance footage revealed that after the fight moved outside, people (mostly employees) milling about in the market found a pair of glasses on the floor in the vicinity of where the struggle occurred. And Defendant was not wearing glasses when he was arrested following the vehicle stop. Finally, in a recorded telephone call with N.H., the Defendant joked that he would have gotten away if he had his glasses and a better car.

As to the two specific guns charged, one with an obliterated serial number, the evidence included the following additional events. Several hours after the vehicle stop on February 19, 2023, the Wethersfield police received a call that a resident along Reed Drive had found a firearm on the side of the road. Officers were dispatched to the area where they located, along the north side of Reed Drive, two firearms and another magazine. At this scene, the police seized a 9mm Tec-9

firearm which appeared to match the distinctive features of the firearm seen in the surveillance footage. This firearm had an obliterated serial number that a firearms examiner was unable to restore. This firearm was also tied to a string as if to be worn around the neck. This is consistent with the surveillance footage which appeared to confirm that the firearm was, in fact, around the assailant's neck and under the front of his parka when he approached S.K. The Tec-9 also had what appeared to be blood near the trigger mechanism.

The police also seized a .40 caliber Hi-Point handgun along Reed Drive. This firearm did not have a magazine. The police additionally seized another extended magazine and some live rounds of 9 mm ammunition along the road.

Reed Drive is in the path of travel between where the Hartford police lost sight of the Camry and the location of the vehicle stop by the Wethersfield police. N.H. testified that during the flight from the market, Defendant threw something black out the passenger-side window of the Camry. Consistent with this testimony, the firearms and magazine were located along the north side of Reed Drive.

The magazines and firearms seized were swabbed for the presence of DNA. The probability ratio for the swabbing on the bloody trigger of the Tec-9 revealed an extraordinarily high likelihood of the presence of Defendant's DNA. Defendant was also identified as a likely contributor to the DNA recovered from the grip of the Hi-Point firearm as well as the magazine seized from the Camry.

Though Defendant has posited that this case was a "who dunnit," it really was not. The evidence, outlined above, was simply overwhelming that during the early morning hours of February 19, 2023, the defendant travelled with N.H. to the market at 675 Wethersfield Avenue in Hartford, Connecticut — not far from the Wethersfield town line. He waited in line, holding a

bottle of water. He was armed with the Tec-9, which had an extended magazine. The Tec-9 was hanging on string around his neck under his coat. The Tec-9, later recovered on Reed Drive, had an obliterated serial number.

Defendant had driven to the market in N.H.'s mother's car, a black Camry, bearing registration AT 06785. Defendant fled the market after assaulting S.K. with the magazine, which resulted in ammunition being splayed about both inside and outside the market. When spotted, he fled from Hartford police, discarded two firearms and ammunition out the passenger's window, and eventually stopped and was arrested approximately 15 minutes after leaving the market. In combination, the surveillance footage, the dashcam and body camera footage, the booking photographs, the DNA analysis, the testimony of N.H., and the other witnesses' testimony, makes it abundantly clear that the jury could have reasonably concluded – as it did – that the Government met its burden of proving each count beyond a reasonable doubt.

Defendant argues that the DNA on the magazine seized from the Camry could have been transferred DNA because the officer who seized the magazine had also searched Defendant's pockets. This appears possible, but not likely, and the jury was permitted to reject this possibility. The probability ratio with respect to the DNA on the magazine seized from the vehicle was that it was 100,000,000,000 times more likely that Defendant was a contributor as opposed to an unknown contributor. A DNA match generally has much lower probability ratios when the presence of the DNA is the result of touch transfer. This issue aside, the jury had ample evidence, as discussed above, to find Defendant guilty on count one, separate and distinct from the magazine and ammunition located in the Camry.

*Motion for a New Trial*

Defendant asks this Court, in the alternative, to grant his request for a new trial in light of the various arguments he advances in his motion for judgment of acquittal. For the same reasons the Court rejects the motion for judgment of acquittal, it rejects the motion for a new trial. The Court sees no injustice, let along manifest injustice, in allowing the verdict to stand and frankly, has no concern, that "an innocent person may have been convicted." *Snype*, 441 F.3d at 140.

**Conclusion**

For all of the foregoing reasons, the Motion for Judgment of Acquittal and for a New Trial is DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 7th day of October, 2025.

                                                */s/ Kari A. Dooley*
                                                KARI A. DOOLEY
                                                UNITED STATES DISTRICT JUDGE